**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**Lexington Division**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | **Chapter 11** |
| **MERV PROPERTIES, LLC,** | : | **Case No. 11-52814** |
| | : | **Judge Tracey N. Wise** |
| **Debtor.** | : | |
| _____ | : | |
| | : | |
| **MERV PROPERTIES, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs:** | : | **Adversary No. 13-5034** |
| | : | |
| **ERIC FRIEDLANDER, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

**MEMORANDUM OPINION DISMISSING CLAIMS AGAINST**
**DEFENDANTS FRIEDLANDER, FIFTH THIRD AND YESSIN**

This adversary proceeding is before the Court on Motions for Summary Judgment and supporting memoranda of law filed by Defendants, Fifth Third Bank ("Fifth Third's Motion") [Docs. 99 & 100], Tim Yessin ("Yessin's Motion") [Docs. 113 & 114], and Eric Friedlander ("Friedlander's Motion") [Docs. 115 & 116].   Following a hearing held on September 11, 2014, the motions were taken under submission.[1]

**JURISDICTION**

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b).   The allegations against the Defendants discussed below are related-to, non-core proceedings which this Court is authorized to hear.   28 U.S.C. § 157(c)(1); *MERV Props., LLC v. Fifth Third Bank (In re MERV*

---

[1]  Also under submission is the motion of Plaintiff MERV Properties, LLC for default judgment against Defendants Mark Properties, LLC ("Mark Properties") and Howard Markowitz ("Markowitz") and Markowitz's motion for dismissal of the Complaint against him on the basis that MERV failed to properly serve him with the Complaint and summons herein.   Resolution of the motions relating to Mark Properties and Markowitz is set forth in separate Opinions.

*Props., LLC)*, No. 5:14-007-DCR, 2014 WL 201614 (E.D. Ky. Jan. 17, 2014).   The parties

presently before the Court expressly consent to this Court entering final orders and judgments.   28

U.S.C. § 157(c)(2).   Venue is proper pursuant to 28 U.S.C. § 1409.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Bankruptcy Procedure 7056, Federal Rule of Civil Procedure

56[2] applies in adversary proceedings.

> [O]n several occasions, the Court of Appeals for the Sixth Circuit has described the
> standard to grant a motion for summary judgment as follows:
>
>> A court must grant summary judgment "if the pleadings, depositions,
>> answers to interrogatories, and admissions on file, together with the
>> affidavits, if any, show that there is no genuine issue as to any material fact
>> and that the moving party is entitled to judgment as a matter of law."
>> Under this test, the moving party may discharge its burden by "pointing out
>> to the [bankruptcy] court . . . that there is an absence of evidence to support
>> the nonmoving party's case."

*Buckeye Ret. Co., LLC, Ltd., v. Swegan (In re Swegan)*, 383 B.R. 646, 652-53 (B.A.P. 6th Cir.

2008) (quoting *Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 198 (B.A.P. 6th Cir. 1998)).   The

Supreme Court instructs that a court must look beyond the pleadings and assess the proof needed

to determine whether there is a genuine need for trial.   *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of
> legitimate inferences from the facts are jury functions, not those of a judge, whether
> he is ruling on a motion for summary judgment or for a directed verdict.   The
> evidence of the non-movant is to be believed, and all *justifiable* inferences are to be
> drawn in his favor.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (emphasis added).   After making an

assessment of the proof, the determinative issue is "whether the evidence presents a sufficient

disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party

must prevail as a matter of law."   *Id.* at 251-52.   In this regard, the moving party carries the

---

[2] References to the Federal Rules of Civil Procedure will appear as "Civil Rule ___," and references to the Federal
Rules of Bankruptcy Procedure will appear as "Bankruptcy Rule ____."

burden of showing there is an absence of evidence to support a claim.   *Celotex Corp. v. Catrett*,

477 U.S. 317, 324-25 (1986).   After the moving party meets this burden, the nonmoving party

must go beyond the pleadings to identify more than a mere scintilla of evidence showing that there

is a genuine issue of material fact for trial.   *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479

(6th Cir. 1989); FED. R. CIV. P. 56(c).   "The respondent cannot rely on the hope that the trier of

fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence

in order to defeat a properly supported motion for summary judgment.'"   *Street*, 886 F.2d at 1479

(quoting *Anderson*, 477 U.S. at 257).

## MERV'S VERIFIED COMPLAINT AS EVIDENCE

As a preliminary matter, MERV did not file affidavits as permitted by Bankruptcy Rule

7056, but claims its verified Complaint may serve as an affidavit for evaluating the pending

summary judgment motions.   Defendant Friedlander contests this proposition.

For the purposes of summary judgment, a verified complaint carries the same evidentiary

weight as an affidavit.   *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *Lavado v. Keohane*,

992 F.2d 601, 605 (6th Cir. 1993).   MERV's Complaint is verified as follows:

> Merv Properties, LLC, by and through its Responsible Party, Vivian Collins,
> states that she has read the foregoing Verified Complaint, consisting of twenty-five
> pages including this page, has first hand and personal knowledge of the facts set
> forth therein and, to the best of her knowledge, information and belief, the facts
> stated herein are true and correct.

Friedlander asserts that the Complaint is not properly verified for purposes of summary judgment

because it is not signed under penalty of perjury in accordance with 28 U.S.C. § 1746, which

provides:

> Wherever, under any law of the United States or under any rule, regulation,
> order, or requirement made pursuant to law, any matter is required or permitted to
> be supported, evidenced, established, or proved by the sworn declaration,
> verification, certificate, statement, oath, or affidavit, in writing of the person
> making the same (other than a deposition, or an oath of office, or an oath required to
> be taken before a specified official other than a notary public), such matter *may*,

with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

. . . .

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.   Executed on (date).["]

28 U.S.C. § 1746 (emphasis added).

"May" is defined as "hav[ing] permission to" or "hav[ing] the liberty to" do something.   *Webster's New Collegiate Dictionary* 704 (G. & C. Merriam Co. 1981).   The term "may" also "indicate[s] a certain measure of likelihood or possibility."   *The American Heritage Dictionary of the English Language* 1112 (3d ed., Houghton Mifflin Co., 1996). . . .

This Court notes that dictionaries also define the term "may" as meaning "must" when used in statutes, deeds, and contracts.   *See Webster's New Collegiate Dictionary* 704; *Webster's Third New International Dictionary of the English Language* (Unabridged) 1396 (Merriam-Webster Inc. 1993).   Webster's New Collegiate Dictionary qualifies this obligatory definition of "may" to circumstances "where the sense, purpose, or policy requires this interpretation."   *Webster's New Collegiate Dictionary* 704. . . .

*Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605, 614 (6th Cir. 2005), *adhered to as amended sub nom. Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546 (6th Cir. 2005).   Friedlander provides no basis for a finding that the "sense, purpose, or policy" of § 1746 requires that a verified complaint must be signed under penalty of perjury.   When considering the practical impact that § 1746 has on court proceedings, the Sixth Circuit explains that "[s]ection 1746 authorizes the use of unsworn declarations under penalty of perjury, *rather than* sworn declarations under oath, whenever the law, rule, regulation, order or requirement *permits* the matter to be supported, evidenced, established or proved by sworn declaration."   *United States v. Gomez-Vigil*, 929 F.2d 254, 258 (6th Cir. 1992) (first emphasis added).   Therefore, that the Complaint here is not sworn to under penalty of perjury does not preclude its use as evidence in the Court's decision on the summary judgment motions.

Nonetheless, to qualify as evidence for summary judgment purposes, the Complaint must meet the requirements of Civil Rule 56(c)(4), applicable herein via Bankruptcy Rule 7056.   To do so, it must: (1) be made on personal knowledge; (2) set forth facts that would be admissible into evidence; and (3) demonstrate that the affiant is competent to testify on the matters stated.   FED. R. CIV. P. 56(c)(4).   Any inadmissible portion of an affidavit or verification made by a notarized signing that fails to meet the three requirements outlined in Civil Rule 56 must be stricken from the testimony.   *Upshaw v. Ford Motor Co.*, 576 F.3d 576 (6th Cir. 2009).   That said, the Sixth Circuit instructs that a court should "use a scalpel, not a butcher knife," when striking portions of an affidavit, or in this instance, a verified complaint, that do not satisfy the requirements of Civil Rule 56(c)(4).[3]   *Id.* at 593 (citation omitted).   Thus, the verified allegations of the Complaint herein will not be considered evidence unless they are supported by personal knowledge, admissible under the Federal Rules of Evidence, and demonstrate that the affiant is competent to testify on the matter.

One classification of testimony that fails to meet the Civil Rule 56 requirements are statements based "upon information and belief."   Such statements are inadmissible for the purposes of supporting or rebutting a motion for summary judgment because they fail to satisfy the personal knowledge requirement established by Civil Rule 56.   *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).

Collins avers that she "has first hand and personal knowledge of the facts set forth therein and, to the best of her knowledge, information and belief, the facts stated herein are true and correct."   Here it appears that Collins has personal knowledge of some of the facts in the Complaint and some of the "facts" are true to the best of her knowledge, information and belief because they are based on information obtained from another source which Collins believes to be

---

[3] In *Upshaw*, the Sixth Circuit refers to Civil Rule 56(e).   In 2010, Civil Rule 56 was restyled by Congress, and former subdivision (e)(1) was carried forward to what is now subdivision (c)(4).

true.[4]   Where it is possible for the Court to "use a scalpel" to discern the facts based on Collins'

personal knowledge, it has done so in the analysis below.   However, MERV is not entitled to

evidentiary effect as to "facts" in the Complaint that are based on statements made by individuals

other than Collins as those statements are inadmissible hearsay to which Collins has identified no

exception.   FED. R. EVID. 801 (inadmissible hearsay is a statement a declarant makes while not

testifying at the current trial or hearing and that a party offers in evidence to prove the truth of the

matter asserted in the statement).   Nor will the Court give evidentiary effect to "facts" in the

Complaint that are otherwise unsupported theories, conclusory facts, or conclusions of law.   *See*

*Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("[U]nsupported allegations

or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to

either support or defeat a motion for summary judgment."), *quoted in Sigmon v. Appalachian Coal*

*Props., Inc.,* 400 F. App'x. 43, 49 (6th Cir. 2010).

### BACKGROUND FACTS AND PROCEDURAL HISTORY

Unless otherwise indicated, the following facts are undisputed.

### I.    The Formation of MERV

The concept of MERV started when the owners of a warehouse on Angliana Avenue in

Lexington, Kentucky, where a monthly antique show was held, announced the conversion of the

warehouse into apartments.   Vivian Collins, one of MERV's current members, participated in the

Angliana antique show.   She started searching for another location for the antique show and

sought investors to fund its purchase.   Collins found a suitable building located on Manchester

Avenue in Lexington ("Manchester Property") and recruited Eric Friedlander, Howard Markowitz

and Roberta Gonzalez to fund the purchase price.   On August 27, 2007, Friedlander, Markowitz

---

[4] For example, the Complaint provides "Collins and Gonzales have been informed, believe and, therefore, assert that Friedlander and/or Markowitz, with the assistance of Yessin, deposited . . . checks without the contractor's signature in the Debtor's account."   [Compl. ¶ 31].

(through his wholly owned entity, Mark Properties), and Gonzalez formed MERV for the purpose

of purchasing and renovating the Manchester Property.   MERV's business plan was to rent space

in the Manchester Property to antique vendors.   Friedlander, Mark Properties and Gonzalez will

be referred to in this Opinion as "the Original Members."

Although the record reflects that a written operating agreement was prepared, there is no

evidence that it was ever executed, and Friedlander contests that the provisions of the operating

agreement are binding.   It is undisputed, however, that MERV did not have a manager and was,

therefore, a member-managed limited liability company.   KY. REV. STAT. ANN. § 275.165(1)

("Unless the articles of organization vest management of the limited liability company in a

manager or managers, management of the business and affairs of the limited liability company

shall vest in the members.").   The Original Members' ownership and voting interest were:

| Member | Ownership | Voting |
|---|---|---|
| Friedlander | 25% | 26.0% |
| Mark Properties | 25% | 25.0% |
| Gonzales | 50% | 49.0% |

Collins was not one of MERV's Original Members.   However, Gonzales agreed to, and

did, transfer one-half of her ownership and voting interest to Collins at a later date.   According to

Collins, Mark Properties and Friedlander were to make a collective contribution to MERV of

$85,000.00 and Gonzales and Collins were to make a collective contribution of $85,000.00 for a

total contribution of $170,000.00.   It is undisputed that Gonzales made the contribution on behalf

of herself and Collins.   Friedlander disputes that he was obligated to make such a contribution,

and Collins concedes that the agreement was never reduced to writing.   While there is a dispute as

to the Original Members' obligation to make a contribution, it is undisputed that MERV was to

eventually reimburse the Original Members for the contributions.   That understanding was

likewise not reduced to writing, but Collins asserts that Friedlander wrote checks to himself as reimbursement for a contribution that he did not make to MERV.

On August 31, 2007, MERV purchased the Manchester Property for $3,090,000.00.   To finance the purchase, MERV obtained a loan in the amount of $2,711,500.00 ("Forcht Bank Loan") from First National Bank of Lexington (now known as Forcht Bank) secured by the Manchester Property.   The Original Members guaranteed the Forcht Bank Loan.   Cash due from MERV at the closing was $392,486.03.   It is undisputed that Gonzales' contribution was applied to MERV's closing costs.   The remainder of the amount necessary for MERV's closing costs came from Black Mountain Realty, an entity owned by Friedlander, which was to be paid a 10 percent commission, or $309,000.00, as one of the realtors of the Manchester Property. Although Friedlander disputes that he was obligated to make any contribution, he characterizes the funds from Black Mountain Realty as a contribution made by him to MERV.   On behalf of MERV, Collins now asserts that the 10 percent commission to Black Mountain Realty was excessive and asserts that Friedlander is not entitled to consider it as a contribution to MERV. However, Collins was not one of the Original Members.   Nor was she present at the closing of the Manchester Property.   There is no evidence that any of the Original Members disagreed with the amount of the commission to Black Mountain Realty or that the commission was otherwise unauthorized by MERV's Original Members.

Part of the Forcht Bank Loan ($441,000.00) was designated as a line of credit from which MERV could draw funds for payment of construction work upon the Manchester Property ("Manchester Construction Fund").   Although the entire fund was disbursed, and the accuracy of the draw requests is highly contested in this proceeding, copies of only four draw requests from the Manchester Construction Fund are in the record.   Those documents are summarized as follows:

| Date | Amount | Contractor(s) and/or Purpose |
|------|--------|------------------------------|
| 10/23/07 | 61,160.00 | Woodall Construction Co., Inc. for grading |
| 09/19/07 | 33,050.00 | Big Ass Fans ($26,550) for fans<br>McCormick ($4,500) for material costs for carpentry<br>Day labor ($2,000) |
| 08/31/07 | 71,145.00 | Meridian Metal ($62,525) for roofing<br>Service Express Heating ($360)<br>American Fire & Security ($7025)<br>C&D Services ($1,125)<br>Graybar $110 |
| 11/07/07 | 59,974.00 | RRC Roofing ($49,974)<br>Misc carpentry ($4,000)<br>Concrete ($6,000) |
| Total | 225,329.00 | |

[Friedlander Mot. Ex. O, Doc. 116-13].

On September 5, 2007, MERV opened a checking account at the Euclid Avenue branch of Fifth Third in Lexington.   The checking account was used as MERV's Operating Account.

Some business checking accounts opened at Fifth Third have an officer assigned to the account as the point of contact for the customer.   The assigned officer is known as a private banker.   Defendant Yessin was assigned to be MERV's private banker.   At the time of his assignment, Yessin had an independent business relationship with Friedlander and Markowitz of which Collins and Gonzales were unaware.   However, according to his testimony, Yessin did not request and was unaware of his appointment as MERV's private banker until Collins asked for copies of documents relating to MERV's account in June 2010.   Three years after MERV opened its Operating Account, and after Fifth Third conducted an investigation conducted in response to concerns raised by Collins, Fifth Third reprimanded Yessin for his failure to disclose to *Fifth Third* that Yessin partnered with Friedlander and Markowitz in an entity known as Farmy LLC during the previous five years while acting as their private banker.

When MERV opened its Operating Account, Friedlander, Markowitz, Gonzalez and Collins each signed the Signature Card for the checking account (even though Collins was not yet

a member of MERV).    The address listed for MERV on the Signature Card was 208 Stone

Avenue, Lexington, Kentucky 40508 ("Stone Avenue Address").    MERV's address was never

changed.    The terms and conditions contained on the Signature Card included the following:

> The terms and conditions stated herein, together with resolutions or authorizations
> which accompany this signature card, if applicable, and the Rules, Regulations,
> Agreements, and Disclosures of Bank constitute the Deposit Agreement
> ("Agreement") between the individual(s) or entity(ies) named hereon
> ("Depositor") and the Bank.

> This Agreement incorporates the Rules, Regulations, Agreements and Disclosures
> established by Bank from time to time, clearing house rules and regulations, state
> and federal laws, recognized banking practices and customs, service charges as
> may be established from time to time and is subject to laws regulating transfers at
> death and other taxes.

> Bank is authorized to recognize the signatures executed hereon in such numbers as
> indicated, for the withdrawal of funds or transactions of any other business
> regarding this account until written notice to the contrary is received by Bank.

> All signers agree to the Terms and Conditions set forth hereon and acknowledge
> receipt of a copy of the Rules and Regulations, Agreements, and Disclosures of
> Bank and agree to the terms set forth therein.

[Howell Aff. Ex. 1, Doc. 100-3].    A copy of the "Rules & Regulations Applicable to All Fifth

Third Accounts and Cards" dated August 2007 ("Rules & Regulations") is attached to the affidavit

of Angela Howell, Retail Risk Manager of Fifth Third.[5]    The Rules & Regulations provide in

relevant part:

> 28.    Customer agrees to carefully examine and reconcile account statements
> and that statements may be mailed or made available to the last known address as
> carried on the records of Bank. . . .    Customer agrees that Bank will not be liable if
> Customer fails to exercise ordinary care in examining their statements.    Customer
> will notify Bank of any discrepancy with any item, including, but not limited to,
> deposits, withdrawals, and checks, within thirty (30) days of the statement mailing
> or made available to customer date.    Customer will also notify Bank of any forgery
> or alteration of any item within thirty (30) days of the statement mailing or made

---

[5] MERV takes the position that the Rules & Regulations are not binding on it because Collins was not given a copy of
those documents at the time the Signature Card was signed.    This argument is unpersuasive.    By her signature on the
Signature Card, Collins' acknowledged receipt of the "Rules and Regulations, Agreements, and Disclosures of the
Bank and agree[d] to the terms set forth therein."    [Howell Aff. Ex. 2].    Further, Collins was not a member of MERV
when the Signature Card was signed and could not have acted on MERV's behalf.    MERV does not identify any
evidence that MERV's Original Members, acting on MERV's behalf, dispute the enforceability of the Rules &
Regulations.

available to customer date.    If notification is not received, Bank will have no liability for such item(s).    Customer also agrees that Bank will have no liability if the item is forged, altered or counterfeited in such a manner that the fraud could not be detected by a reasonable person.    Customer assumes all liability for unauthorized signatures produced by a facsimile signature or device or stamp.

   29.    Customer assumes liability for any improper endorsements by payees.

   . . . .

   31.    Customer may not, in all cases, get return of their original deposit account documents, including checks (items). . . .    Customer may obtain a copy of their deposit account items upon request.    Bank reserves the right to charge a reasonable fee for these services.

[Howell Aff. Ex. 3, at 9].    The Rules & Regulations further provide that the fee for obtaining a

copy of a check is $5.00 per copy, and the fee for a copy of a bank statement is $5.00 per copy.

   Friedlander, Markowitz, Gonzalez and Collins also signed a separate Deposit Account

Resolution concerning the checking account which provides as follows:

   The undersigned certify(ies) that MERV PROPERTIES LLC ("Company") is the name used in the conduct of an unincorporated business and in order to establish a deposit account in the name of the company the undersigned resolve as follows:

   . . . .

   RESOLVED FURTHER that Bank is authorized to pay or otherwise honor or apply without inquiry and without regard to the application of the proceeds all checks, drafts, and other orders for the payment, transfer and withdrawal of money from any and all accounts maintained by this Company with Bank, including those drawn to the individual order of a signer, when signed, accepted or endorsed by any TWO of the following officers or employees of this Company:

| PRINTED OR TYPED NAME | TITLE | SIGNATURE |
|---|---|---|
| Vivian L. Collins | | /s/Eric Friedlander[6] |
| Eric Friedlander | | /s/Vivian L. Collins |
| Roberta Pauline Gonzalez | | /s/Roberta Pauline Gonzales |
| Howard Markowitz | | /s/Howard Markowitz |

   RESOLVED FURTHER, that any 2 of the above-named officer(s), person(s), member(s), or partners(s) is/are hereby authorized on behalf of this Company . . . .

---

[6]  The signatures of Collins and Friedlander appeared opposite each other's name instead of in the appropriate location, but that is of no consequence to the Court's analysis.

[Howell Aff. Ex. 2].   Thus, Collins, Friedlander, Gonzales and Markowitz were the authorized

Signatories on MERV's Operating Account and the signature of two of them was required for all

checks written on that account.   Finally, the Deposit Account Resolution provides that "the Bank

is authorized to rely upon the foregoing resolution until receipt by Bank of written notice of any

change or revocation."   [Howell Aff. Ex. 2].

While MERV's Operating Account was open, Fifth Third sent monthly account statements

to MERV at the Stone Avenue Address.   Fifth Third sent each account statement to MERV ten

business days after the end of the statement period.   Those statements describe each item paid

during the statement period by item number, amount, and date of payment.   The statements also

describe by date and amount each deposit made into the account during the statement period.   The

monthly statements do not include copies of the checks or deposit slips.

The last check written on MERV's Operating Account cleared on August 24, 2010, and is

reflected on the statement for the period August 1, 2010, through August 31, 2010.   The statement

for that period was sent to MERV on or about September 14, 2010 (ten business days after

August 31, 2010).   MERV's Operating Account was closed on September 3, 2010.

Contrary to the requirements set forth on the Signature Card and Deposit Account

Resolution, it is undisputed that a substantial majority of the checks written on MERV's Operating

Account were signed by only one of the authorized Signatories.   The evidence also reveals that all

of the authorized Signatories—Collins, Friedlander, Gonzales and Markowitz—wrote checks with

only one signature (their own) and that Fifth Third honored all of those checks.

Fifth Third concedes that it was not authorized to honor such checks.   After confirming

that MERV's account was set up to require two signatures, Howell, testified:

> Q.   . . .   Now, given the policy and procedures that states that this is a contract
> between the Bank and the customer, is there any reason that you can think of that a
> customer would not be entitled to rely on the fact that two signatures would be
> required on any check that clears Fifth Third Bank written on the MERV account?

12

A.   This is a product that we do not offer clients.   It should not have been set up this way.   We don't have a way to monitor that there are truly two signatures coming through and those are run through proof processing machines.

Q.   But the fact remains that it was filled out this way and the customer was assured that two signatures would be required.   So from what you're saying, the customer should not have been told that two signatures would be required.

A.   Correct.

[Howell Dep. 18:24—19:13, July 29, 2014, Doc. 127-2].

Checks written by Forcht Bank for draws on the Manchester Construction Fund were deposited into MERV's Operating Account at Fifth Third.   Fifth Third's internal operating procedure provides:

Checks payable to two parties, i.e., John and Mary Smith, cannot be cashed with only one signature; both parties MUST sign and be present.   The check may be deposited into an account with the same ownership, but cannot be deposited into an account titled in the name of only one of the two parties on the check.[7]

It is undisputed that several of the draws from the Manchester Construction Fund, although payable to MERV and a third party or solely to a third party, were deposited into MERV's Operating Account without the proper endorsement of the third party.   Fifth Third asserts, and MERV does not dispute, that the last of the Forcht Bank checks making disbursements from the Manchester Construction Fund was deposited into MERV's Operating Account on January 18, 2008.

On May 12, 2008, the Original Members and Collins entered into an agreement whereby Gonzalez assigned one half of her membership and voting interests in MERV to Collins in exchange for the nominal consideration of one dollar.   At that time, the members' ownership and voting interest were:

---

[7]   This quotation appears in a document filed under seal on August 22, 2014.   The document remains sealed pending the Court's ruling on a Motion to Set Aside Order Denying Motion to Seal Documents [Doc. 173] filed May 1, 2015, by Fifth Third and Yessin.

| Member | Ownership | Voting |
|---|---|---|
| Friedlander | 25% | 26.0% |
| Mark Properties | 25% | 25.0% |
| Gonzales | 25% | 24.5% |
| Collins | 25% | 24.5% |

Friedlander, Mark Properties, Collins and Gonzalez will be referred to collectively in this Opinion as "the Members."[8]

On July 29, 2009, James Steptak ("Steptak") signed an agreement to purchase Friedlander's 25 percent membership interest in MERV for $50,000.00.   However, there remains an ongoing dispute regarding whether the agreement is binding on Steptak and whether Steptak or Friedlander now owns that membership interest.   Nonetheless, Friedlander was never removed as a signatory on MERV's Operating Account.

In May and June 2010, Steptak and Collins went to the Euclid Avenue branch of Fifth Third in Lexington and requested a copy of the Signature Card for MERV's Operating Account and copies of all checks drawn upon the account.   Collins testified by deposition that a teller at the Euclid Avenue branch advised them that Yessin was "over" the MERV account.   Yessin testified that the meaning of this statement was that he was the private banker for the MERV account. According to Collins, the teller told her and Steptak that they needed to make their request to Yessin, who had an office at Fifth Third's main branch in downtown Lexington.

Collins and Steptak subsequently went to that office and requested copies and were again told by a bank representative that Yessin was "over" the MERV account.   Yessin was contacted by the bank representative.   Yessin testified that at that time he did not recognize the name MERV Properties, LLC.   However, when he looked up the MERV account on the bank's system and saw

---

[8] MERV makes multiple references to Gonzales and Collins as being the minority owners and Friedlander and Markowitz (through his ownership of Mark Properties) as being the majority owners of MERV and asserts that "Friedlander and Markowitz could outvote Collins and Gonzalez on any issue."   [MERV Resp. to Fifth Third Mot. 5, Doc. 127].   However, MERV fails to explain the relevance of this fact to the matters before the Court.

that Markowitz was one of the signatories for the account, Yessin called Markowitz, who advised

Yessin to give Collins whatever she wanted.    Yessin then spoke with Collins and gave her a copy

of the Signature Card and the Deposit Account Resolution for MERV's Operating Account.

Yessin also advised Collins how she could order copies of the checks drawn upon the account.

Collins later placed an order for copies of the checks.    Someone from Fifth Third

thereafter called Collins and told her that her copies were ready.    Collins testified that someone at

the bank initially told her that copies would cost approximately $65.00.    However, when the

copies were ready, a bank representative told her that MERV's account would be charged

$5,000.00 for the copies.    At that point, Fifth Third had already deducted the $5,000.00 from

MERV's account.    In its Complaint, MERV asserts that "Markowitz, with Yessin's assistance,

caused that transaction to be reversed and Collins was not able to obtain those records. . . ."

[Compl. ¶ 37].    There is no evidence that Collins made any further efforts to obtain the requested

records.

## II.    The Bankruptcy Case

MERV filed its voluntary chapter 11 petition on October 10, 2011.    At the time the

petition was filed, Collins and Gonzales each held a one-third membership interest.    Friedlander

and Steptak continued to dispute ownership of the other one-third interest.    There is no evidence

of the disposition of Mark Properties' former 25 percent membership interest.

Collins was designated to perform the duties of MERV in the bankruptcy case.    The Court

confirmed a plan of reorganization on July 13, 2012, which required MERV to make certain

payments to Forcht Bank, MERV's largest secured creditor.    MERV failed to make payments.

Forcht Bank declared a default on September 19, 2012, and then sought the sale of the Manchester

Property pursuant to the terms of the plan.

Subsequent to the court-approved auction of the Manchester Property, MERV filed a

motion to dismiss its chapter 11 case on the basis that any remaining property owned by MERV

was of nominal value and was not worth administering.   However, MERV withdrew its motion on

March 27, 2013, and filed amended schedules to include potential prepetition claims against

Friedlander, Markowitz, Forcht Bank, Fifth Third Bank and other possible defendants.   MERV

asserted it had potential claims against the defendants for breach of fiduciary duty, embezzlement,

fraud and other causes of action related to the diversion of funds from MERV by the defendants.

On July 9, 2013, John E. Davis was appointed as special counsel for MERV to investigate

and prosecute the claims described in the amended schedules.

## III.   The Adversary Proceeding

On October 4, 2013, MERV, through its "Responsible Party" Collins, filed its verified

Complaint against Friedlander, Markowitz, Mark Properties, Fifth Third, Yessin and Forcht

Bank.[9]   Remaining Members Collins and Gonzalez (and disputed member Steptak) are not

Defendants.   The Complaint generally asserts claims against Friedlander under a variety of

theories, including breach of contract, fraud, theft and breach of fiduciary duty.   In addition,

MERV asserts claims against Fifth Third and Yessin for breach of contract, fraud or facilitation of

fraud, theft and, in the case of Yessin, breach of fiduciary duty.   Each claim is discussed below by

movant.

## LAW AND ANALYSIS

## I.   MERV's Claims Against Friedlander

MERV asserts claims against Friedlander for: (i) breach of contract; (ii) fraud, or in the

alternative, theft; and (iii) breach of fiduciary duty.[10]   MERV further asserts claims against

---

[9]  The claims asserted against Forcht Bank have been dismissed.

[10]  MERV consented to the dismissal of its claim for usurpation of corporate opportunity.

Friedlander to recover fraudulent conveyances and punitive damages.    As to all claims,

Friedlander asserts MERV fails to establish essential elements of those claims; and thus,

Friedlander is entitled to summary judgment on each.    The Court agrees.

A.    Breach of Contract – Counts I and III.

MERV asserts two theories for breach of contract claims against Friedlander.    In Count I,

MERV claims that Friedlander and Mark Properties breached the contract to make an initial

capital contribution to MERV in the amount of $85,000.00.    In Count III, MERV claims that

Friedlander breached an agreement that all checks written on MERV's Operating Account

required two authorized Signatories.[11]

Kentucky law governs the breach of contract claims.    The elements for breach of contract

under Kentucky law are: (1) the existence of a contract between the parties; (2) a breach of that

contract; and (3) damages.    *See Tex. Capital Bank, N.A. v. First Am. Title Ins. Co.*, 822 F. Supp.

2d 678, 683 (W.D. Ky. 2011).    To survive summary judgment, MERV must first identify or

produce evidence of the existence of a contract.    "In Kentucky, the elements to establish the

existence of a contract are: offer and acceptance, full and complete terms, and consideration."    *Ky.*

*Emps. Ret. Sys. v. Seven Counties Servs., Inc. (In re Seven Counties Servs., Inc.)*, 511 B.R. 431,

477 (Bankr. W.D. Ky. 2014).

1.    Contract to make capital contribution.

Friedlander asserts alternatively that either he was not obligated to make a contribution (no

contract existed), or if he was so obligated, he did so by contributing a commission due on the

purchase of the Manchester Property (no breach).    While it is undisputed that there is no fully

executed written agreement among the Members requiring them to make a capital contribution,

MERV argues there is an enforceable verbal agreement.

---

[11]  As discussed above, the authorized Signatories were Friedlander, Markowitz, Gonzales and Collins.

An obligation of members to make contributions to a limited liability company is unenforceable unless set forth in a writing signed by the member.   KY. REV. STAT. ANN. § 275.200.   Moreover, to the extent any agreement required MERV to repay the capital contributions, making them in the nature of loans, the applicable statute of frauds bars enforcement of an agreement to make a loan that is not in writing.   KY. REV. STAT. ANN. § 371.010(9) (Kentucky Statute of Frauds provides that no action may be brought to enforce an agreement to loan money unless such agreement is in writing and signed by the party to be charged.).   There is no evidence of an enforceable contract to make a capital contribution.   Accordingly, Friedlander is entitled to judgment on Count I and it is unnecessary to address his alternative argument that no breach occurred.

> ### 2. Contract to have checks written on or presented for payment from MERV's Operating Account signed by two authorized Signatories.

Friedlander disputes he entered into any contract with MERV wherein he agreed that checks written on or presented for payment from MERV's Operating Account required two authorized Signatories.   According to Friedlander, the Signature Card and Fifth Third Bank Deposit Account Resolution are agreements between Fifth Third and MERV—not between MERV and its Members.   Friedlander's position has merit.   The fundamental elements of a valid contract are "offer and acceptance, full and complete terms, and consideration.   For the terms to be considered complete they must be definite and certain and must set forth the promises of performance to be rendered by each party." *Energy Home, Div. of So. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (citations omitted) (internal quotation marks omitted). MERV provides no authority or analysis to support its arguments that Friedlander's signature on the Signature Card or the Deposit Account Resolution creates an enforceable contract between MERV and Friedlander.

a)   *Signature Card*

MERV concedes in its response to Friedlander's Motion that "[w]hile it may be

questionable as to whether the signature card could be considered a contract between the signers,

MERV asserts that it is a contract."   [MERV Resp. to Friedlander Mot. 4, Doc. 134].   This is the

extent of MERV's argument.   MERV does not provide any analysis as to how the Signature Card

satisfies any of the elements necessary to support a conclusion that the Signature Card is a contract

between MERV and its authorized Signatories as opposed to a contract between MERV and the

bank.   The only reference of a requirement for two signatures on the Signature Card is a notation

of "Sig.(s) # Req'd 02" that appears in a box listing "MERV PROPERTIES LLC" as the title of the

account.   "With no factual or legal basis presented, we are loathe to create an argument for a party

and will not practice the case for them."   *Lindsay v. Orosz*, Nos. 2013-CA-001709-ME,

2014-CA-000004-ME, 2014 WL 4177416, at *9 (Ky. Aug. 22, 2014); *accord Ruhl v. Spear*, No.

2:11-cv-1026, 2012 WL 1537594, at *3 (S.D. Ohio Apr. 30, 2012) (plaintiff's complaint and

briefing presented the court with "less than ideally developed discussion," and it is simply not the

proper role of the court to create arguments for a plaintiff that might fit his allegations).

A court is not required to speculate upon which portion of the record the nonmoving party

relies, nor is it obligated to wade through and search the record for specific facts that may support

the nonmoving party's claim.   "Rule 56 contemplates a limited marshalling of evidence by the

nonmoving party sufficient to establish a genuine issue of material fact for trial."   *Interroyal*

*Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).   Thus, MERV fails to identify any

evidence or law in support of its contention that the Signature Card constitutes an enforceable

contract between MERV and Friedlander.

b)  *The Deposit Account Resolution*

Likewise, the Deposit Account Resolution is an offer by Fifth Third and acceptance by

MERV to establish a deposit account subject to the rules and regulations of Fifth Third, not a

contract between MERV and its Members or the Signatories.   The signatures appear after the

following language:

> RESOLVED FURTHER that Bank is authorized to pay or otherwise honor or
> apply without inquiry and without regard to the application of the proceeds all
> checks, drafts, and other orders for the payment, transfer and withdrawal of money
> from any and all accounts maintained by this Company with Bank, including those
> drawn to the individual order of a signer, when signed, accepted or endorsed by any
> TWO of the following officers or employees of this Company:

[Howell Aff. Ex. 2, Doc. 100-3].   The placement of the signatures makes it clear that the

Signatories signed the Deposit Account Resolution solely to establish a list of "officers or

employees" authorized to sign checks and make other transfers from or deposits into MERV's

Operating Account.

Once again, MERV fails to identify or provide any evidence or analysis of an offer,

acceptance and consideration in support its argument that the Deposit Account Resolution

constitutes an enforceable contract between MERV and Friedlander.

c)  *Operating Agreement*

Finally MERV makes a half-hearted argument that "MERV's Operating Agreement also

had the two-signature requirement."   [MERV Resp. to Friedlander Mot. 4-5, Doc. 134].   Perhaps

realizing the futility of this argument because it could not produce an executed operating

agreement, this single sentence is the extent of MERV's argument.   Again, the Court will not

practice the Plaintiff's case for it.   *Ruhl*, 2012 WL 1537594, at *3; *Lindsay*, 2014 WL 4177416, at

*9.

Moreover, even the unexecuted operating agreement does not require two signatures on

every check.   It provides:   "All withdrawals from the savings account, and all checks written on

the operating account in excess of $999, shall require two (2) signatures, one of which shall be that

of Howard Markowitz (who is the manager of Mark Properties, LLC, a Member herein)."

[Friedlander Mot. Ex. G ¶ 4.1, Doc. 116-6].   The Deposit Account Resolution does not contain

any such conditions.

In conclusion, MERV fails to identify even a scintilla of evidence of that Friedlander is

contractually obligated to obtain two authorized Signatories on each MERV check and Friedlander

is entitled to judgment on Counts I and III of the Complaint.[12]

B.  Fraud, Theft and Breach of Fiduciary Duty – Counts IV and VIII.

MERV bases its assertions of fraud on a theory that Friedlander and Markowitz had sole

control of MERV's finances, and with such control they were in a position to, and did, send false

draw requests to Forcht Bank to obtain disbursements from the Manchester Construction Fund.

Then, posits MERV, they deposited the funds into MERV's Operating Account and wrote checks

to themselves, or entities owned or controlled by them, without "providing documentary

justification or proof of a business purpose."   [Compl. ¶¶ 63-68].

In a Kentucky action for fraud, the party claiming harm must establish six
elements of fraud by clear and convincing evidence as follows: a) material
representation b) which is false c) known to be false or made recklessly d) made
with inducement to be acted upon e) acted in reliance thereon and f) causing injury.

*United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *see also Denzik v. Denzik*,

197 S.W.3d 108, 111-12 (Ky. 2006) ("Actual fraud, as opposed to constructive fraud, consists in

successful deception intentionally practiced to induce another party to part with property or some

legal right.").   "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."   FED. R. CIV. P. 9 (made applicable to adversary

---

[12] In the absence of evidence of a contract, it is unnecessary to address Friedlander's alternative argument that MERV
is estopped from enforcing any contract that may have obligated him to obtain another authorized signature on
any checks written on MERV's Operating Account, because all of MERV's Members and Markowitz wrote, received, and
endorsed checks on MERV's Operating Account without obtaining two authorized Signatories.

proceedings by FED. R. BANKR. P. 7009).   "As plaintiff on all misrepresentation theories,

[MERV] has the burden of establishing each claim element.   It must prove all fraud elements by

clear and convincing evidence."   *First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, No.

5:12-CV-289-REW, ___ F. Supp. 3d ___, at ___, 2014 WL 5093395, at *16 (E.D. Ky. Oct. 9,

2014).

"Where the facts or circumstances of a case only allow for inferences, conjecture, or

suspicion, such as would leave reasonably prudent minds in doubt, there is a failure of proof to

establish fraud."   *Id.*, 2014 WL 5093395, at *20 (citations omitted) (internal quotation marks

omitted).   However, MERV's claim for fraud may be developed "by the character of the

testimony, the coherency of the entire case as well as the documents, circumstances and facts

presented.   Fraud may be established by evidence which is wholly circumstantial."   *United

Parcel Serv. Co.*, 996 S.W.2d at 468.   "As to the final element of fraud by misrepresentation,

[MERV] need not prove the amount of damages with certainty; it only must establish with

certainty the existence of damages."   *First Tech. Capital*, 2014 WL 5093395, at *21 (citations

omitted) (internal quotation marks omitted).

In support of the allegations in Count IV and asserting that it has provided evidence of each

element of fraud, MERV states:

> Friedlander represented himself to MERV as an expert in real estate and
> construction and that he would protect and benefit MERV and its property.[13]
> Given his conduct concerning the false draw requests, the shoddy construction by
> jack leg contractors who owed him and the numerous checks that he wrote to
> himself from the very formation of MERV and the acquisition of its property, that
> was a material misrepresentation that Friedlander knew was false when he made it
> but intended MERV and it [sic] members to rely on his representations and MERV
> did.   As a result of MERV's reliance, MERV did not object when he seized control

---

[13] Here MERV appears to contend that its allegations of fraud against Friedlander also arose from an alleged
representation as to Friedlander's expertise in the areas of real estate and construction.   However, this allegation
appears only in MERV's brief without citation to any supporting evidence.   Nor does the verified Complaint contain
any assertions that Friedlander held himself out as an expert in real estate or construction.   Allegations of fraud must
be stated with particularity.   FED. R. CIV. P. 9(b).

of MERV's finances nor did it, initially demand oversight thereby allowing Friedlander to obtain funds from Forcht Bank by false claims and then failed to make the improvements he represented to Forcht Bank and MERV would be made. Then, having accumulated excess funds in MERV's account, wrote himself checks with [sic] providing any proof that he was entitled to obtain those funds.   These actions severely damaged MERV.   Thus, each requirement to prove fraud can be and has been shown by MERV.   While Friedlander may dispute some of the assertions, that is not relevant in deciding a summary judgment motion.   MERV is entitled to have all of their facts accepted as true and it is also entitled to have all inferences made in its favor.

[MERV Resp. to Friedlander Mot. 13, Doc. 134].

    1.  <u>Friedlander's representations as to the draw requests to obtain funds from the Manchester Construction Fund</u>.

According to MERV, the draw requests were false because they were based on estimates from contractors whose services were not used to renovate the Manchester Property.   MERV claims that after receiving the draws from the Manchester Construction Fund based on such false information, Friedlander deposited the draw checks into MERV's Operating Account without obtaining the signature of the contractor(s) to whom the checks were also, or solely, payable. Significantly, there is no dispute that the checks issued on the draw requests were deposited into MERV's Operating Account—they were not deposited by Friedlander into his own account or into the account of any entities owned or controlled by him.   Nor is there any dispute that endorsements of copayees were not always obtained.   MERV theorizes that once the funds were deposited, Friedlander used "jack leg" contractors who performed the work for a lower cost, used affiliates of Friedlander, or the work was never done.   MERV concedes, however, that all contractors who performed work on the Manchester Property were paid.

When specifically asked by interrogatory to provide *facts* to support its allegations that Friedlander submitted false draw requests, MERV stated:

      Friedlander insisted that he and Markowitz would manage the construction/ renovation of Merv'[s] property and, as such, were the sole contacts with Forcht for construction issues and draws.   In that position, Friedlander prepared and delivered all draw requests on that construction loan.   However, instead of basing

his draw requests on contracts or invoices as is customary, he submitted the draw requests primarily using only bids from subcontractors to his banker friend at Forcht Bank.   That banker would then approve the draw request and issue a check without the customary questions being raised and without requiring a lien waiver from the subcontractor.   However, despite receiving payment for the described work, Friedlander almost never awarded a contract to the subcontractor whose bid was used for the draw request and then failed or refused to actually have the work done by anyone.   *Merv believes, and therefore asserts, that Friedlander never intended to have the work done and, instead, intended to take those proceeds for his and Markowitz's personal use.*   While some draw checks were issued solely to Merv, most were issued and payable to Merv and a subcontractor, a two-party check, or solely to the subcontractor, a third party check.   Despite that fact, Friedlander simply deposited those two-party and third party checks into Merv's Fifth Third Bank checking account using his friend and partner, Yessin, to ensure that no questions were asked.

Once the funds were deposited into Merv's account, *Friedlander and Markowitz would then write checks to themselves or to entities they controlled without a legal or factual basis and without disclosure to or the approval of Merv's other members. . . .   Instead of using the construction loan proceeds to improve Merv's property, Friedlander and Markowitz took those funds without authority for their own personal use leaving Merv without the funds necessary to pay its bills as those bills came due which, ultimately, led to the loss of Merv's property and the investment in time and money made by Merv's minority members.*

[MERV Resp. to Friedlander Interrog. 2-3, Doc. 59 (emphasis supplied)].   MERV cannot rely on

these conclusory allegations, without more.   MERV's beliefs do not amount to *evidence* and the

inferences MERV posits are not "justifiable."   *Anderson*, 477 U.S. at 255.   They are instead

MERV's own conclusions based on conjectures and suspicions, and are unsupported and

insufficient to defeat Friedlander's Motion.   *See First Tech. Capital*, 2014 WL 5093395, at *20

(facts or circumstances leading only to inferences, conjecture or suspicions do not establish fraud);

*Galindo*, 754 F.2d at 1216 ("[U]nsupported allegations or affidavits setting forth ultimate or

conclusory facts and conclusions of law are insufficient to either support or defeat a motion for

summary judgment."); *Street*, 886 F.2d at 1479 (MERV must "'present affirmative evidence in

order to defeat a properly supported motion for summary judgment.'") (quoting *Anderson*, 477

U.S. at 257).

Contrary to MERV's unsupported assertions, Friedlander's deposition testimony is that, of the four draw requests that are in the record, he prepared one and faxed the others to Forcht Bank. Friedlander acknowledges that on several occasions, a different contractor than that identified in the draw request was used to complete the work or a renovation was changed or not completed. This notwithstanding, there is no evidence that the funds were used for an improper purpose or that the alternate contractors did "shoddy" work.   Even if draw requests prepared by someone else and faxed by Friedlander somehow became Friedlander's representations, such representations were made to Forcht Bank—not *MERV*.   Specifically, the draw requests were made on behalf of MERV to induce Forcht Bank to disburse funds from the Manchester Construction Fund.   The mere fact that after MERV received the funds, they were used for a different purpose, without more, cannot support MERV's fraud claims against Friedlander.   MERV presents no evidence of injury to MERV resulting from draw requests.   Contrary to its conclusory allegations quoted above, MERV fails to identify any evidence that: (i) any work performed by the contractors who were used and paid to renovate the Manchester Property was inferior and caused injury; (ii) any of the contractors were somehow indebted to, "owed" Friedlander, or were affiliated with Friedlander; or (iii) that Friedlander refused to have necessary improvements done after obtaining funds for such work to be completed.

MERV provides no evidence of false representations in the draw requests or injury resulting therefrom and, as a result, MERV's fraud claim against Friedlander based on any draw requests he submitted to Forcht Bank fails as a matter of law.

　　　2.　Friedlander's representations that he was entitled to reimbursement of expenses.

A second factual basis for its fraud claims against Friedlander is MERV's contention that: (i) Friedlander wrote checks to himself for his personal credit card bills in an amount in excess of $20,000.00; (ii) Markowitz and Friedlander wrote checks to cash in a collective amount in excess

of $11,000.00; and (iii) Friedlander wrote checks to himself or entities controlled by him in an amount in excess of $127,000.00.   [Compl. ¶¶ 63-66, 68].   Friedlander does not dispute that he wrote checks on MERV's Operating Account payable to himself and entitles controlled by him. Such action by Friedlander constitutes a representation to MERV that he is entitled to receive the money, and Friedlander's testimony is that he wrote the checks to reimburse himself and his businesses for legitimate expenses incurred on behalf of MERV.

Again, MERV fails to provide affirmative, admissible evidence to refute this testimony and instead takes the position that the Court should find that the mere existence of checks made payable to Friedlander or entities owned or controlled by him is evidence of fraud.   There are copies of checks in the record payable to Friedlander and entities owned or controlled by him [MERV Resp. to Fifth Third Mot. Ex. R, Doc. 142-3; *see also* Friedlander Mot. Ex. J., Docs. 118-120] that are consistent with MERV's calculation of amounts paid to Friedlander and entities owned or controlled by him.   However, MERV bears the burden to show the Court how the evidence it identifies is relevant to the theory it seeks to prove.   Barring an obvious connection between the evidence and the issues to be proven, it is not the Court's responsibility to make the party's case.

> Although the Court has independently reviewed some of the voluminous exhibits, this examination has not been exhaustive.   The Court does not believe that when counsel fails to direct the Court to a particular portion of an exhibit which supports counsel's argument, it has a duty to examine all the exhibits in minute detail to identify evidence supporting counsel's position.

*Nazar v. Wills (In re Wills)*, Ch. 7 Case No. 05-17977, Adv. No. 06-05337, 2008 WL 4498802, at *1 n.3 (Bankr. D. Kan. Oct. 1, 2008).   MERV claims that it asked Friedlander to provide invoices or receipts to support his contention that checks payable to him or his business entities were for payment or reimbursement of MERV's legitimate business expenses and Friedlander refused to

provide the information.   MERV does not dispute that Friedlander is entitled to reimbursement

for MERV's legitimate business expenses:

> He [Friedlander] was told that [he was entitled to be reimbursed for legitimate
> business expenses] before this litigation was filed and during the discovery period.
> Therefore, the only reasonable inference that can be drawn from this failure to
> produce the requested documentary proof is that it does not exist and the funds
> taken by Friedlander were for personal use and were not spent to benefit MERV.

[MERV Resp. to Friedlander Mot. 10, Doc. 134].   However, as persuasively argued by

Friedlander, even if such requests were made during the discovery process, MERV did not pursue

Friedlander's alleged failure to respond.   Discovery is now closed.   MERV's position that it is

Friedlander's burden to establish that the checks he wrote to himself and to his entities were for

MERV's legitimate business expenses is simply wrong.   "Actual fraud is never presumed, nor is

there a shifting of burden on account of relationships, as is true in cases of constructive fraud.   It

must be proven by either express testimony or convincing circumstances. . . ."   *Combs v. Poulos*,

44 S.W.2d 571, 573 (Ky. 1931).   The mere existence of the checks is not "convincing

circumstances" that Friedlander made false representations of entitlement to reimbursement of

expenses.   MERV does not provide any coherent analysis of what those checks prove as to its

claims against Friedlander for fraud.   Again, its allegations are based on suspicion and conjecture,

and its inferences are not justifiable.

MERV's claim of fraud against Friedlander based on any checks payable to Friedlander or

his business entities thus fails as a matter of law.

> 3.   <u>Lack of evidence as to theft/breach of fiduciary duty</u>.

The same conjecture regarding improper checks/disbursements to Friedlander underlies

MERV's claims of theft, conversion and breach of fiduciary duty.

Count IV of the Complaint alternatively asserts a claim against Friedlander for theft or civil

conversion.   Neither Friedlander nor MERV specifically addresses the elements necessary for

MERV to support a claim of theft or conversion against Friedlander.    However, MERV's claim of

theft is based on the same factual allegations which underlie its fraud claims, set out in detail

above.

> The elements of conversion require proof that (1) the Plaintiff had legal title to the
> converted property; (2) the Plaintiff had possession of the property or the right to
> possess it at the time of conversion; (3) the Defendants exercised dominion over the
> property in a manner which denied the Plaintiff's rights to use and enjoy the
> property and which was to the Defendants' own use and beneficial enjoyment; (4)
> the Defendants intended to interfere with the Plaintiff's possession; (5) the Plaintiff
> made some demand for the property's return which the Defendants refused; (6) the
> Defendants' act was the legal cause of the Plaintiff's loss of the property; and (7)
> the Plaintiff suffered damage by the loss of the property.

*Tolliver v. Bank of Am. (In re Tolliver)*, 464 B.R. 720, 742 (Bankr. E.D. Ky. 2012).    As reviewed

above, MERV fails to identify evidence that the checks payable to Friedlander or his business

entities were not legitimate.    As such, MERV fails to identify evidence that Friedlander exercised

dominion over MERV's funds in a manner that denied MERV's right to use and enjoy its property

or that Friedlander used MERV's funds for his own use and beneficial enjoyment.

　　　MERV also asserts that Friedlander owed it a fiduciary duty and a duty of fair dealing and

that he breached that duty.[14]    Friedlander concedes that as a Member of MERV he was in a

fiduciary relationship with MERV.    He denies, however, that he breached such duty.

　　　To prevail on its claim of breach of fiduciary duty, MERV must prove that:

(1) Friedlander owed it a fiduciary duty; (2) he breached that duty; and (3) that MERV suffered

damages as a result of the breach.    *Fastenal Co. v. Crawford,* 609 F. Supp. 2d 650 (E.D. Ky.

2009) (citing *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 n.15 (Ky. Ct. App. 2000).

"Under Kentucky law, a fiduciary relationship is 'founded on trust or confidence reposed by one

person in the integrity and fidelity of another and which also necessarily involves an undertaking

---

[14] MERV also asserts that Friedlander owed a fiduciary duty to the minority members, which are alleged to be Collins and Gonzales.    However, Collins and Gonzales are not party plaintiffs, and whether Friedlander owed a fiduciary duty to them as members is irrelevant.

in which a duty is created in one person *to act primarily for another's benefit* in matters connected

with such undertaking.'"   *Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 892

(6th Cir. 2002) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky.

1991) (emphasis added)).

MERV's breach of fiduciary duty claim is based on the same factual allegations upon

which it bases its claims for breach of contract, fraud, and theft; *i.e.,* that Friedlander failed to make

an initial contribution to MERV, filed false construction draws, failed to use the Manchester

Construction Fund to complete "promised construction" [MERV Resp. to Friedlander Mot. 17,

Doc. 134] on the Manchester Property, and wrote checks to himself and entities owned or

controlled by him without justification.   MERV asserts that because of Friedlander's actions,

MERV lost its business and the Manchester Property and suffered financial damages exceeding

$3,000,000.00.   Therefore, the viability of MERV's breach of fiduciary duty claim is contingent

on the success of at least one of the claims alleged in Count I, III, or IV against Friedlander.   As

discussed above, MERV fails to identify evidence to support any of those claims.

4. Lack of evidence as to damages.

Finally, MERV also fails to adequately identify any evidence of injury or damages

resulting from its allegations in Counts I, III, IV, or VIII.   At summary judgment, MERV "need

not prove the amount of damages with certainty; it only must establish with certainty the *existence*

of damages."   *First Tech. Capital*, 2014 WL 5093395, at *21 (emphasis added).

When requested by interrogatory to state the amount and nature of damages claimed

against Friedlander, MERV alleged that Friedlander and Markowitz were jointly liable to MERV

in the amount of $265,000.00 for checks written to themselves or entities owned by them without

any legal or factual justification.   As discussed above, MERV does not identify any evidence to

support its position that any of the checks payable to Friedlander or entities owned by him were not

for legitimate business expenses incurred by Friedlander.    It is MERV's burden to make use of the

discovery process to attempt to obtain that evidence, if any exists.    While MERV, as the

nonmovant, is entitled to "justifiable inferences" based on the evidence, the Court reiterates that

the mere existence of checks payable to Friedlander or his entities, coupled with Friedlander's

failure to voluntarily provide receipts does not constitute a justifiable inference that the checks

were not reimbursement for legitimate business expenses.[15]

The only additional damage "evidence" identified by MERV is the following assertion:

> [T]here are damages that have not yet been fully quantified including (i) sums
> received by Friedlander from payments required from contractors that were
> allowed to work on Merv's property, (ii) the loss of Merv's property including the
> loss of the initial investment made by Merv's minority shareholders and Merv's
> equity in the real property and its business, (iii) additional expenses incurred by
> Merv as a result of Merv's inability to pay its bills, including its mortgage, such as
> legal fees and costs, and (iv) punitive damages based on their [Friedlander's and
> Markowitz's] misconduct which, Merv asserts, satisfies the statutory requirements
> for the award of these damages but can not be quantified since these damages are
> set by the court.

[MERV Resp. to Friedlander Interrog. 8, Doc. 59].    With respect to item (i) above, MERV

appears to assert that Friedlander received kickbacks from contractors that were hired to perform

the renovations on the Manchester Property.    MERV fails to identify any evidence to support such

assertion; nor does the Complaint contain any such allegations.    Further, none of MERV's

Members are plaintiffs in this adversary, and any alleged loss incurred by "minority shareholders"

is either irrelevant or not adequately explained.    Finally, MERV fails to identify even a

scintilla—let alone more than a mere scintilla—of evidence that Friedlander is responsible for

MERV's loss of its real property, its business or any of the additional expenses alleged.

Thus, in addition to the other elements of MERV's claims for which it fails to raise a

genuine issue of material fact, MERV also fails to identify evidence of damages sustained by it

---

[15] In passing, the Court notes that there is no explanation of why checks payable to or signed only by Collins or
Gonzales are legitimate, while checks payable to or signed only by Friedlander or Markowitz, or entities owned or
controlled by them, including Mark Properties, are fraudulent.

that are attributable to any of the claims it asserts against Friedlander.    Friedlander is entitled to

judgment as a matter of law on all claims against him set forth in Counts I, III, IV and VIII.

    C.  <u>Fraudulent Conveyance and Punitive Damages – Count X and XI.</u>

MERV asserts that around the time it filed its chapter 11 petition, Friedlander transferred

all or substantially all of his properties to his sister and a partner for little or no consideration.

MERV characterizes these transfers as fraudulent conveyances or preferences which it contends

should be set aside.

Friedlander contends that MERV is not a creditor of Friedlander, essentially raising a

standing issue.    MERV agrees it is not a creditor and must prevail on its Complaint against

Friedlander to assert a claim.    "Thus, this cause of action is prophylactic and in anticipation of

success in this action."    [MERV Resp. to Friedlander Mot. 18, Doc. 134].    *See* FED. R. CIV. P.

18(b)[16] (Permitting joinder of two claims even though one is contingent on the disposition of the

other, and "[i]n particular, a plaintiff may state a claim for money and a claim to set aside a

conveyance that is fraudulent as to that plaintiff, without first obtaining a judgment for the

money.").

MERV acknowledges that the fraudulent conveyance claim was filed in anticipation of its

successful prosecution of its claims herein against Friedlander and that it is not otherwise

Friedlander's creditor.    Thus, where MERV is not entitled to an award of damages against

Friedlander, any conveyances by Friedlander cannot be "fraudulent as to that plaintiff [MERV]."

FED. R. CIV. P. 18(b).

MERV's final claim against Friedlander is for punitive damages.

However, a claim for punitive damages is not a separate cause of action, but an
available remedy.    *See, e.g., Salisbury v. Purdue Pharma, L.P.,* 166 F. Supp. 2d
546, 548 n. 1 (E.D. Ky. 2011).    Moreover, a claim for punitive damages must fail
where, as in the present action, there has been a "failure to assert a claim on which

---

[16] Made applicable to adversary proceedings by Bankruptcy Rule 7018.

actual damages can be awarded [.]"    *Ammon v. Welty,* 113 S.W.3d 185, 188 (Ky. 2002).

*Cass JV, LLC v. Host Int'l, Inc.*, No. 312-CV-00359-CRS-DW, 2014 WL 3955366, at *9 (W.D. Ky. Aug. 13, 2014).

Friedlander is entitled to summary judgment as a matter of law as to Counts X and XI.

D.    Conclusion.

Friedlander's Motion persuasively argues there is an absence of evidence to support MERV's claims against him.    MERV does not present any affirmative admissible evidence to defeat Friedlander's Motion and Friedlander is entitled to a judgment as a matter of law in his favor.

## II.    **MERV's Claims Against Fifth Third**

A.    Governing Law.

MERV asserts claims against Fifth Third for: (i) breach of contract (Count III); and (ii) fraud, or in the alternative, facilitation of fraud and theft (Count V).    Fifth Third contends that Kentucky's Uniform Commercial Code ("KUCC") provides a comprehensive remedy with respect to MERV's common law claims, and therefore, those claims are displaced by the KUCC.    Thus, in analyzing MERV's claims against Fifth Third, the Court must first determine whether the KUCC or common law applies to the particular claims.

The KUCC provides:

(1) The Uniform Commercial Code shall be liberally construed and applied to promote its underlying purposes and policies, which are:

(a) To simplify, clarify, and modernize the law governing commercial transactions;

(b) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and

(c) To make uniform the law among the various jurisdictions.

(2) *Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud,*

*misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or
invalidating cause, supplement its provisions.*

(3) Official comments to the Uniform Commercial Code, as published from
time to time by the National Conference of Commissioners on Uniform State Laws,
represent the express legislative intent of the General Assembly and shall be used
as a guide for interpretation of this chapter, except that if the text and the official
comments conflict, the text shall control.

KY. REV. STAT. ANN. § 355.1-103 (emphasis added).   The Official Comments to the Uniform

Commercial Code ("UCC") § 1-103 state:

**Applicability of supplemental principals of law**.   Subsection [(2) of
§ 355.1-103] states the basic relationship of the Uniform Commercial Code to
supplemental bodies of law.   The Uniform Commercial Code was drafted against
the backdrop of existing bodies of law, including the common law and equity, and
relies on those bodies of law to supplement it provisions in many important ways.
At the same time, the Uniform Commercial Code is the primary source of
commercial law rules in areas that it governs, and its rules represent choices made
by its drafters and the enacting legislatures about the appropriate policies to be
furthered in the transactions it covers.   Therefore, while principles of common law
and equity may *supplement* provisions of the Uniform Commercial Code, they may
not be used to *supplant* its provisions, or the purposes and policies those provisions
reflect, unless a specific provision of the Uniform Commercial Code provides
otherwise.   In the absence of such a provision, the Uniform Commercial Code
preempts principles of common law and equity that are inconsistent with either its
provisions or its purposes and policies.

U.C.C. § 1-103 cmt. 2.   The purpose of § 355.1-103 "cannot be served if parties can avoid the

requirements of the UCC by pleading common law causes of action along with their UCC claims

*for the same alleged transgressions.*"   *Metz v. Unizan Bank*, 416 F. Supp. 2d 568, 582 (N.D. Ohio

2006) (emphasis added).

In analyzing whether an account holder's common law claims are displaced by the KUCC,

the Kentucky Supreme Court states:

The question of whether the UCC has displaced other principles of law and
equity in a given situation is one that must be decided in each case.   The proper
balance tends to favor application of the UCC and displacement of other law.
Since the Code was promulgated to lend as much stability and certainty to
commercial law as possible, it should be applied whenever possible.   Thus, the
prevailing view now is that when the UCC provides a comprehensive remedy for
the parties to a transaction, common-law and other non-Code claims and remedies
should be barred.   As a result, courts dealing with "hard cases" should be hesitant

33

to recognize common-law or non-U.C.C. claims or to employ common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC.

. . . .

Displacement of common law does not require an explicit statement to that effect each time it occurs.   Instead, the UCC should also be understood to intend the displacement of the common law whenever both the code and the common law would provide a means of recovery for the same loss.

A majority of jurisdictions decide UCC-displacement questions with the "comprehensive rights and remedies test."   Under that rule, where the Code provides a comprehensive remedy for the parties to a transaction, a common law action will be barred.

This Court concludes that with respect to the transactions at issue, the UCC provides a comprehensive remedy, or scheme of remedies.   The list of scenarios directly covered by Articles 3 and 4 is long . . . .   Article 4 . . . allocates losses among banks dealing with . . . the liability between the bank and the customer for payment on unauthorized signature or altered instrument, KRS 355.4–406.   While this listing is far from complete, the Articles 3 and 4 system of remedies itself is intended to be a comprehensive allocation scheme for check fraud losses.

. . . .

Of course, the recredit remedy for an unauthorized payment, that is, one based on an unauthorized signature, is through KRS 355.4–406 and related statutes.

*Mark D. Dean, P.S.C. v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 506-07 (Ky. 2014)

(citations omitted) (internal quotation marks omitted).

MERV's claims against Fifth Third for breach of contract and fraud are premised on: (i) Fifth Third's failure to enforce the two-signature requirement to checks it honored that were drawn on MERV's Operating Account; and (ii) Fifth Third's failure to require proper endorsement on checks issued by Forcht Bank from the Manchester Construction Fund before depositing them into MERV's Operating Account.   As discussed below, the KUCC provides a comprehensive framework setting out the parties' respective duties and remedies governing the relationship between a bank and its account customers and provides specific remedies with respect to improper or unauthorized activity in the customer's account.   Here, MERV's claims for breach of contract and fraud are displaced by the KUCC.

B. <u>Breach of Contract – Count III</u>.

1. <u>Application of KUCC to unauthorized checks</u>.

The KUCC defines an unauthorized signature:   "If the signature of more than one (1)

person is required to constitute the authorized signature of an organization, the signature of the

organization is unauthorized if one of the required signatures is lacking."   KY. REV. STAT. ANN.

§ 355.3-403(2).   The KUCC further defines when a check is properly payable from a customer's

account:

> (1) A bank may charge against the account of a customer an item that is
> properly payable from that account even though the charge creates an overdraft.
> An item is properly payable if it is authorized by the customer and is in accordance
> with any agreement between the customer and bank.

KY. REV. STAT. ANN. § 355.4-401(1).

Fifth Third acknowledges that the checks written on MERV's account with only one

signature did not constitute checks bearing an authorized signature and were not properly payable

by the bank.   The ramifications of Fifth Third honoring unauthorized checks, the respective duties

of MERV and Fifth Third in relation thereto, and the parties' remedies are governed by KUCC

§ 355.4-406, which provides, in relevant part:

> (1) A bank that sends or makes available to a customer a statement of account
> showing payment of items for the account shall either return or make available to
> the customer the items paid or provide information in the statement of account
> sufficient to allow the customer reasonably to identify the items paid.   The
> statement of account provides sufficient information if the item is described by
> item number, amount, and date of payment.
>
> (2) If the items are not returned to the customer, the person retaining the items
> shall either retain the items or, if the items are destroyed, maintain the capacity to
> furnish legible copies of the items until the expiration of seven (7) years after
> receipt of the items.   A customer may request an item from the bank that paid the
> item, and that bank must provide in a reasonable time either the item or, if the item
> has been destroyed or is not otherwise obtainable, a legible copy of the item.
>
> (3) If a bank sends or makes available a statement of account or items pursuant
> to subsection (1) of this section, the customer must exercise reasonable promptness
> in examining the statement or the items to determine whether any payment was not
> authorized because of an alteration of an item or because a purported signature by

or on behalf of the customer was not authorized.   If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

. . . .

(6) *Without regard to care or lack of care of either the customer or the bank*, a customer who does not within one (1) year after the statement or items are made available to the customer (subsection (1)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. . . .

KY. REV. STAT. ANN. § 355.4-406 (emphasis added).   In addition to the requirements of

§ 355.4-406, the KUCC provides that "[a]n action to enforce an obligation, duty, or right arising

under this [article 4] must be commenced within three (3) years after the claim for relief accrues."

KY. REV. STAT. ANN. § 355.4-111.

Fifth Third's duties are: (1) to send or make available to the customer account statements

showing each item by item number, amount, and date of payment; and (2) upon a customer's

request, to provide within a reasonable time either the items or legible copies of the items.   During

the time period in which MERV's Operating Account at Fifth Third was open, it is undisputed that

Fifth Third sent monthly account statements to MERV at the Stone Avenue Address which was the

address provided on the Signature Card.   It is undisputed that MERV's address was never

changed.   However, MERV argues that there is a disputed question of fact as to whether Fifth

Third sent the bank statements to MERV because:

[It] is not disputed, that [the Stone Avenue Address] is not MERV's address but rather is the address of Friedlander's office.   At that office, Friedlander kept those records in [a] locked office and denied MERV's other members access to that office and those records.   Furthermore, the Bank, through its representative, Yessin, knew that the address to which MERV's statements were sent was actually that of Friedlander's office and not that of MERV since he regularly visited those offices, spent time there talking with Friedlander and Markowitz, but not Collins or Gonzalez, and would often accept deposits from Friedlander and/or Markowitz to be processed at the Bank.   Thus, given the requirements of Kentucky law set forth above, it is a question of fact whether those [bank] statements were actually sent to MERV or whether they were sent to Friedlander.   In addition, it is undisputed that Friedlander claims to have sold his membership in MERV in mid-2009 to [Steptak].   However, when MERV tried to change the Signature Card, the Bank,

36

> apparently based on its policies and procedures, would not permit MERV to do so
> without Friedlander's cooperation.    Thus, even after Friedlander asserts that he
> was no longer a member, MERV's statements were . . . still sent to Friedlander's
> office.

[MERV Resp. to Fifth Third Mot. 13-14, Doc. 127].    MERV's position has no basis in law.

MERV suggests that because the Stone Avenue Address was Friedlander's office that it could not

also be MERV's office address.    But the Stone Avenue Address is the only address provided to

Fifth Third and that address was never changed.    The questions of whether (i) the Stone Avenue

Address was also Friedlander's personal office address, (ii) Friedlander denied Collins and

Gonzales access to the office and/or to MERV's business records, (iii) Yessin visited Friedlander

at the Stone Avenue Address, or (iv) Fifth Third refused to change the Signature Card without

proper documentation,[17] are all irrelevant.    Fifth Third is entitled to and did rely on the address

provided to it by MERV as set forth in the Signature Card.    Whether there is conflict among

MERV's Members does not change this analysis.    *See Euro Motors, Inc. v. Sw. Fin. Bank & Trust

Co.*, 696 N.E.2d 711 (Ill. Ct. App. 1998) (one-year notification requirement in UCC § 4-406(f)

applied regardless of arguments that corporate customer could not have discovered that checks

payable to president were not cosigned as required because president had control of financial

documents evidencing unauthorized payments).

It is undisputed that neither the specific items, nor copies thereof, were returned to MERV

with the monthly statements.    Thus, on MERV's request, Fifth Third was required to provide it

with copies of the items within a reasonable time.    KY. REV. STAT. ANN. § 355.4-406(2).    MERV

identifies uncontradicted evidence that beginning in May 2010, Collins and Steptak, acting on

behalf of MERV, attempted to obtain copies of the bank statements, checks and deposit slips from

Fifth Third and were advised that because Yessin was the private banker assigned to the account,

---

[17] *See* MERV Resp. to Fifth Third Interrog. 5, Doc. 57 (prior to changing the Signature Card, Fifth Third required new documents signed by all members, old and new).

his approval was required for them to obtain the copies.   Collins testified that she was originally

told by a bank employee that the fee for the records would be approximately $65.00.   There is no

evidence as to what records were to be provided by Fifth Third for that amount.   Collins further

testified that when Fifth Third made the records available, it charged $5,000.00 for the records

rather than $65.00.   MERV asserts that this allegedly excessive charge was an attempt by Fifth

Third and Yessin to prevent MERV from obtaining its records and discovering the unauthorized

checks and Friedlander's and Markowitz's alleged fraud.   In support, MERV asserts that

substantially the same records containing 1,219 copies were provided to the Commonwealth's

Attorney at a cost of $326.75 ($.25 per copy).

With respect to the fees charged by a bank when providing copies of items required by

KUCC § 355.4-406(2), the UCC Official Comments provide:

> This Act does not specify sanctions for failure to retain or furnish the items or
> legible copies; this is left to other laws regulating banks.  . . .   Moreover, this Act
> does not regulate fees that banks charge their customers for furnishing items or
> copies or other services covered by the Act, but under principles of law such as
> unconscionability or good faith and fair dealing, courts have reviewed the
> bank's exercise of a discretion to set fees.   In addition, Section 1-203 provides that
> every contract or duty within this Act imposes an obligation of good faith in its
> performance or enforcement.

U.C.C. § 4-406 cmt. 3 (citations omitted).   "The doctrine [of unconscionability] forbids only

one-sided, oppressive, and unfairly surprising contracts, and not mere bad bargains.

Unconscionability is determined on a case-by-case basis, but it is ultimately a question of law to be

determined by the court."   *MERV Props., LLC v. Friedlander (In re MERV Props., LLC)*, Ch. 11

Case No. 11-52814, Adv. No. 13-5034, 2014 WL 801509, at *6 (Bankr. E.D. Ky. Feb. 27, 2014)

(alteration omitted) (citations omitted) (internal quotation marks omitted).   *See also Whirlpool*

*Corp. v. Grigoleit Co.*, 713 F.3d 316, 322 (6th Cir. 2013) (unconscionability is determined by

analyzing the facts and circumstances present when a contract was made); *Coursey v. Caterpillar,*

*Inc.*, 64 F.3d 662 (6th Cir. 1995) (unpublished table decision) (per curiam) (determination of

unconscionability requires the application of legal principles to subsidiary factual determinations); *J&E Constr., Inc. v. Bobcat Enters., Inc.*, No. 07–325–JBT, 2008 WL 3982683, at *8 (E.D. Ky. Aug. 26, 2008) (determination of unconscionability of a contract is a question of law).

Within every contract, there is an implied covenant of good faith and fair dealing. However, an implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights. *Farmers Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). "A party does not breach the covenant of good faith and fair dealing when it acts according to the express terms of a contract for which it bargained." *Webb v. Republic Bank & Trust Co.*, No. 3:11-CV-00423, 2013 WL 5447709, at *4 (W.D. Ky. Sept. 27, 2013) (alteration omitted) (citation omitted) (internal quotation marks omitted).

In *Webb*, the plaintiff claimed unconscionability and breach of the covenant of good faith and fair dealing based on the defendant bank's policy of sorting transactions on a daily basis from highest to lowest in dollar amount and charging a $35.00 overdraft fee for each transaction in order to maximize its overdraft fee revenue. The court found that the plaintiff in *Webb*, like MERV, had executed a signature card agreeing to be bound by the bank's account rules, which included an agreement to pay overdraft charges. The account rules were subsequently amended, and the court found that plaintiff consented to the amendment by failing to timely exercise the opt-out options. Thus, the court dismissed the claims for charges assessed after the effective date of the amendment because both the policy of sorting transactions by dollar amount and the amount of the overdraft fee were authorized by the amendment to the parties' contract.

The contract between MERV and Fifth Third provides for a fee of $5.00 per copy for checks and bank statements. MERV indicates that it was charged $5,000.00 for substantially the same records obtained by the Commonwealth's Attorney. Those records consisted of 1,219

pages; which according to the contract between MERV and Fifth Third, would have allowed Fifth

Third to charge $6,095.00 (1,219 x $5.00) for the records.   The amount charged to another party

for the records is irrelevant; Fifth Third is entitled to charge MERV for copies according to the

contract between it and MERV.   There is no disputed material fact to the contrary.   Fifth Third's

charge of $5,000.00 is not unconscionable as a matter of law, and Fifth Third satisfied its

obligations under § 355.4-406.[18]

Turning to MERV's obligations, in describing the duties of the customer under UCC

§ 4-406, one court has stated:

> [Section 355.4-406(3)] imposes two duties upon the bank customer: (1) the duty to
> "exercise reasonable promptness" in examining bank statements and canceled
> checks to determine whether there have been any unauthorized payments, and (2)
> the duty to promptly notify the bank of unauthorized payments that should have
> come to the customer's attention.   If the customer discovers an error and promptly
> reports it, the customer has complied with [§ 355.4-406(3)]. . . .   *If the customer
> waits more than one year to report an unauthorized signature, the customer is
> barred from recovering against the bank, regardless of the bank's lack of care in
> paying the instrument*.

*Chester Twp. Bd. of Trs. v. Bank One, N.A*., No. 2005-G-2660, 2007 WL 1881311, at *4 (Ohio Ct.

App. June 29, 2007) (emphasis added) (citations omitted) (internal quotation marks omitted).

The record reflects that between May 24, 2010, and June 10, 2010, Collins and Steptak

made telephone calls to Fifth Third employees to discuss multiple concerns regarding activities in

MERV's Operating Account, including a claim that approximately $150,000.00 was allegedly

missing from MERV's account and that Fifth Third was honoring checks that weren't cosigned.

MERV asserts that these communications satisfy the notice requirements of § 355.4-406(6).

However, merely putting Fifth Third on notice of suspicion that unauthorized checks had been

honored is insufficient to meet the notice requirements of § 355.4-406(6).

---

[18] A disagreement among the Members and reversal of the payment for the copies taken from MERV's Operating
Account that resulted in Collins not obtaining the copies, does not affect Fifth Third's satisfaction of its obligation.

> [A] generalized statement regarding suspicions of embezzlement is not the
> equivalent of an unequivocal statement notifying [bank] of an unauthorized
> signature, as required by [§ 355.4-406(3)].   While it may be sufficient to place
> them on notice of wrongdoing, in a good faith analysis pursuant to
> [§ 355.4-406(4)], it is not "notice" as required by [§ 355.4-406(3)].

*Chester Twp.*, 2007 WL 1881311, at *6; *see also Hatcher Cleaning Co. v. Comerica Bank-Tx.*, 995

S.W.2d 933, 938 (Tex. Ct. App. 1999) (specific item must be identified; "[g]eneral references to a

possible forgery are not sufficient 'reports' of 'items' under . . . section 4.406."); *Watseka First*

*Nat'l Bank v. Horney*, 686 N.E.2d 1175, 1179-80 (Ill. Ct. App. 1997) (request for copies of checks

and bank statements for four-year period because of suspicion of forgery is insufficient notice to

bank).   The communications by Collins and Steptak were insufficient to satisfy MERV's duty to

report the unauthorized signatures to Fifth Third.

Ms. Howell, an employee of Fifth Third, testified that MERV's Operating Account was

improperly opened to require two signatures because Fifth Third did not offer that option and did

not have a way to ensure that the checks were signed by two authorized Signatories.   This

notwithstanding, MERV still seeks redress for the same transgressions—paying checks with

unauthorized signatures.   Thus, MERV was still required, within one-year from the date the

statements were sent, to report the unauthorized signatures.   *Compare Wilson & Muir Bank &*

*Trust Co. v. Travelers Cas. & Sur. Co. Am.*, No. 3:08-CV-489-H, 2010 WL 456866, at *2 (W.D.

Ky. Feb. 3, 2010) ("This Court favors the apparent majority position that good faith is not a

condition precedent to enforcement of the repose period [of § 355.4-406(6)].") and *Chester Twp.*,

2007 WL 188131, at 7-8 (declining to "judicially create a good faith provision [in § 355.4-406(6)]

where one does not exist") *with Falk v. N. Trust Co.*, 763 N.E.2d 380 (Ill. App. Ct. 2001) (public

policy of placing burden on customer to determine unauthorized checks is not served when bank is

a party, either actively or passively to a scheme to defraud customer and where facts establish that

bank acted in "bad faith" as opposed to "lack of care," it is not entitled to the protection of the prerequisite of notice in [§ 355.4-406(6)]].

The last check cleared MERV's Operating Account on August 24, 2010, and the statement with respect thereto was sent ten business days after the statement period ending August 31, 2010—or by September 14, 2010.   Thus, MERV had one year,[19] or until September 14, 2011, to notify Fifth Third of the unauthorized signatures, yet this adversary proceeding was not filed until October 4, 2013.   There is no evidence that MERV satisfied the notice requirement that is essential for it to pursue a claim against Fifth Third for honoring checks lacking authorized signatures.

MERV's claims based on Fifth Third's honor of unauthorized checks are barred by its failure to comply with § 355.4-406(6).[20]

2.   Application of KUCC to improper deposits into MERV's Operating Account of draws from the Manchester Construction Fund.

KUCC § 355.3-110(4) provides:

If an instrument is payable to two (2) or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced *only* by all of them.   If an instrument payable to two (2) or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons alternatively.

KY. REV. STAT. ANN. § 355.3-110(4) (emphasis added).   It is undisputed that Fifth Third permitted checks drawn on the Manchester Construction Fund to be deposited into MERV's Operating Account without proper endorsements of third parties.   In doing so, Fifth Third failed to comply with not only the KUCC but also its internal policies.

Generally, claims against a bank for accepting deposits of checks without proper endorsement by all parties to the checks give rise to a cause of action for conversion against the

---

[19]  It is unnecessary to address Fifth Third's argument that the one-year notification period in KUCC § 355.4-406(6) was modified to thirty days pursuant to Fifth Third's Rules and Regulations.

[20] MERV's argument that a "discovery rule" should toll the statute is addressed *infra* LAW AND ANALYSIS, Part II.B.3.

depositary bank that negotiated the check without the proper endorsement.    *See Tri-County Nat'l Bank v. Greenpoint Credit, LLC*, 190 S.W.3d 360 (Ky. Ct. App. 2006).   The KUCC provides "The law applicable to conversion of personal property applies to instruments.   An instrument is also converted if . . . a bank made or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. . . ."   KY. REV. STAT. ANN. § 355.3-420(1).

KUCC §§ 355.3-110(4) and 355.3-420 provide a remedy for a bank's failure to require proper endorsement of a check presented to it for payment.   Here MERV does not assert that the funds were not deposited into its Operating Account.   Rather, MERV's theory is that the improper deposits provided a larger pool of funds in MERV's Operating Account which Friedlander and Markowitz then diverted to themselves and/or entities owned or controlled by them through the vehicle of the unauthorized checks.   MERV's allegations as to how it was damaged are not the normal consequences of a bank's failure to obtain proper endorsements for deposits.   Even so, as with the unauthorized check claims, MERV's common law breach of contract claims which are based on the improper endorsements are displaced by the KUCC.   *See Mark D. Dean, P.S.C.*, 434 S.W.3d at 510 ("While it is questionable whether [MERV] even had a cause of action here, this Court is satisfied that the circumstances of this case are governed by the UCC's Articles 3 and 4," which provide a comprehensive scheme of remedies for the deposit of improperly endorsed negotiable instruments.).

Further, "[u]nless governed by other law regarding claims for indemnity or contribution, an action: . . . (c) To enforce an obligation, duty, or right arising under this [article 3] and not governed by this section must be commenced within three (3) years after the claim for relief accrues."   KY. REV. STAT. ANN. § 355.3-118(7)(c).   A cause of action under § 355.3-118(7) accrues when the bank makes or obtains payment with respect to the instrument.   *Bradley v. Nat'l*

43

*City Bank of Ky.*, No. 2003-CA-002711-MR, 2004 WL 3017297, at *2 (Ky. Ct. App. Dec. 30, 2004) (citations omitted) (internal quotation marks omitted).

It is undisputed that the last deposit into MERV's Operating Account of a check drawn on the Manchester Construction Fund was made on January 18, 2008.   Pursuant to § 355.3-118(7), MERV was required to commence an action against Fifth Third based on those deposits on or before January 18, 2011.   Thus, the statute of limitations for this claim expired before MERV filed bankruptcy (October 10, 2011) or this adversary proceeding (October 4, 2013). Accordingly, as a matter of law, MERV's assertion that the statute of limitations was tolled under 11 U.S.C. § 108(a)[21] by the filing of the bankruptcy case is without merit.

As such, MERV fails to identify evidence that it timely commenced an action against Fifth Third based on the bank's failure to require proper endorsements on the checks drawn on the Manchester Construction Fund.

3. <u>Discovery Rule</u>.

MERV asserts that the discovery rule should be applied to toll both the one-year notice period under § 355.4-406(6) for unauthorized checks and the statute of limitations set forth in § 355.3-118 for the unauthorized deposits.   "Kentucky courts hesitate to apply the discovery rule without statutory authority to do so."   *John W. Stone Oil Distrib., LLC v. PBI Bank, Inc*., No. 3:09-CV-862-H, 2011 WL 560422, at *3 (W.D. Ky. Feb. 8, 2011).

---

[21] 11 U.S.C. § 108(a) provides:

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and *such period has not expired before the date of the filing of the petition*, the trustee may commence such action only before the later of—
>
>> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>>
>> (2) two years after the order for relief.

(Emphasis supplied).

Whether the discovery rule applies at all to claims arising under the UCC is a
difficult and, in Kentucky, novel question.   The discovery rule is available only in
limited circumstances, namely, "where the fact of injury or offending
instrumentality is not immediately evident or discoverable with the exercise of
reasonable diligence, such as in cases of medical malpractice or latent injuries or
illnesses."   *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010).   And
substantial authority in other jurisdictions suggests that the discovery rule should
not apply to the UCC at all when a negotiable instrument, such as a check, is at
issue.   *See, e.g., Menichini v. Grant*, 995 F.2d 1224, 1229–30 (3d Cir. 1993)
("Where a party not engaging in fraudulent concealment asserts the statute of
limitations defense, most courts have refused to apply the discovery rule to
negotiable instruments, finding it inimical to UCC policies of finality and
negotiability."); *see also New Jersey Lawyers' Fund for Client Protection v. Pace*,
186 N.J. 123, 892 A.2d 661, 662 (2006) ("[T]he time of discovery rule does not
apply under the UCC").

*Mark D. Dean*, 434 S.W.3d at 502.   In *Mark D. Dean*, the court went on to find that the

discovery rule was not available under facts of the case where it was clear that reasonable diligence

on the part of the bank customer would have exposed check kiting and thus revealed the financial

harm.

MERV does not identify evidence to support its contention that Fifth Third sought to

prevent MERV from obtaining copies of the checks and/or deposit slips from which MERV asserts

it could have earlier discovered Friedlander's or Markowitz's alleged fraudulent actions.   Further,

the evidence reflects that Friedlander, Markowitz, Collins and Gonzales all wrote, received and/or

endorsed checks written on MERV's Operating Account that were not signed by two authorized

Signatories.   Therefore, all relevant parties were on notice that Fifth Third was honoring

unauthorized checks prior to the time Fifth Third allegedly thwarted any attempts to obtain

MERV's bank records in May and June 2010.

Fifth Third is entitled to summary judgment as a matter of law as to Count III.

C.   Fraud or Facilitation of Fraud and Theft – Count V.

In Count V, MERV asserts claims against Fifth Third for fraud or facilitation of fraud and

theft.   MERV's theory is as follows:   Yessin was a business partner of Friedlander and

Markowitz.   As such, Yessin had a substantial conflict of interest that was adverse to MERV.

Fifth Third knew or should have known of the relationship, but did not disclose it to MERV.   Fifth

Third permitted Yessin to be appointed as MERV's private banker which put him in a position to

control, supervise and oversee MERV's Operating Account.   From that position, Yessin

controlled deposits into and disbursements out of MERV's Operating Account.   Yessin

authorized and permitted Friedlander and/or Markowitz to deposit the improperly endorsed checks

written on the Manchester Construction Fund into MERV's Operating Account, and then enabled

Friedlander and/or Markowitz to remove those funds from MERV's Operating Account by

honoring unauthorized checks that Friedlander and Markowitz had made payable to themselves

and related entities, including an entity in which Yessin also had an interest.   The unauthorized

checks and improper deposits complained of in Count V are the same items of which MERV

complains in Count IV (fraud claims against Friedlander) and suffer from the same lack of

supporting evidence as a factual matter.

Additionally, MERV presents Collins' testimony that Yessin's assistant assured Collins

and Gonzales that checks would require two signatures to be honored.   In support of its contention

that this representation was false, MERV points to Howell's deposition testimony that Fifth Third

did not have the capability of confirming that each check would be cosigned; thus, arguing that the

misrepresentation was intentional.

Fifth Third counters that the fraud claims in Count V are displaced by the KUCC and are

barred as a result of MERV's failure to timely notify the bank of the unauthorized checks and

failure to timely bring an action for the unauthorized deposits.

> Although framed as a misrepresentation claim, [plaintiff] seeks to hold the bank
> liable for paying the checks despite the "unauthorized signature or alteration."
> Legal analysis of a claim focuses on the essence of the alleged wrong for which a
> plaintiff seeks redress and not on either the name or the legal theory applied to that
> claim.  *See Strid v. Converse*, 111 Wis. 2d 418, 423, 331 N.W.2d 350, 353 (1983)
> ("'[A] cause of action is not constituted by labeling the operative facts with the

name of a legal theory.   The operative facts themselves, if they show the invasion of a protected right, constitute the cause of action.   What they are called is immaterial.'") (quoted source omitted).

*Weber, Leicht, Gohr & Assocs. v. Liberty Bank*, 620 N.W.2d 472, 476 (Wis. Ct. App. 2000).   The purposes of the KUCC "cannot be served if parties can avoid the requirements of the [KUCC] by pleading common law causes of action along with their [KUCC] claims *for the same alleged transgressions.*"   *Metz v. Unizan Bank*, 416 F. Supp. 2d at 582 (emphasis added); *see also*, 1B LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, § 1-103:432 (3d ed. 2014) ("A claim for misrepresentation on the grounds that a payor bank misrepresented that it would compare the signature on the paid checks with the signature card is displaced by the U.C.C. § 4-406 [Rev].") (citing *Weber, Leicht, Gohr & Assoc.*, 620 N.W.2d 472).

MERV's breach of contract claims are displaced by the KUCC and MERV failed to comply with the notice requirements of § 355.4-406(6).   It is clear that MERV's claims against Fifth Third for fraud or facilitation of fraud or theft are based on the same alleged transgressions as the breach of contract claims; i.e., honoring unauthorized checks and permitting deposits of improperly endorsed checks.

This Court finds the reasoning in *Weber* persuasive.   MERV's claims of fraud and/or facilitation of fraud or theft against Fifth Third are merely MERV's theory of a scheme that is still grounded on Fifth Third accepting improper deposits and honoring unauthorized checks.   Under the facts of this case, MERV's claims against Fifth Third, by whatever name, are displaced by the KUCC and fail for the reasons set forth in *Weber*.

Fifth Third is entitled to summary judgment as a matter of law as to Count V.

### III.    MERV's Claims Against Yessin

MERV asserts claims against Yessin for: (i) fraud, or in the alternative, facilitation of fraud or theft (Count V); and (ii) breach of fiduciary duty (Count VIII).   Yessin generally asserts that

these claims are each predicated on a finding that Yessin controlled deposits into and withdrawals

from MERV's account at Fifth Third and the admissible evidence is to the contrary.   The Court

agrees.[22]

     A.   <u>Fraud, or in the Alternative, Facilitation of Fraud and Theft – Count V</u>.

     MERV's theory of fraud or facilitation of fraud and theft against Yessin can be

summarized as follows:   Yessin had a conflict of interest in serving as MERV's private banker at

the same time he was a co-owner of another business entity with Friedlander and Markowitz.

Yessin did not disclose the independent business relationship with Friedlander and Markowitz to

Collins or Gonzalez.   In his capacity as MERV's private banker, Yessin controlled which checks

written on MERV's Operating Account would be paid by Fifth Third, and he controlled which

funds were allowed to be deposited into the account.   Yessin then allowed Friedlander and

Markowitz to take withdrawals from MERV's Operating Account by means of checks bearing

only one signature, even though Yessin was aware that the Deposit Account Resolution required

two signatures for any check drawn on the account.   The funds which Yessin permitted to be

withdrawn by Friedlander and Markowitz were used for their own personal benefit, or at the very

least the funds were not used for MERV's benefit.   MERV was damaged by the amount of those

withdrawals.

     MERV further alleges:   Yessin allowed checks drawn on the Manchester Construction

Fund that were jointly payable to MERV and suppliers of labor and materials for the Manchester

Property, or payable solely to suppliers, to be deposited into MERV's Operating Account bearing

only MERV's endorsement.   MERV was damaged because the Manchester Construction Fund

proceeds deposited into the account were not used for improvement of the Manchester Property or

---

[22] Alternatively, Yessin asserts that the claims are displaced by the KUCC as to him also.   It is unnecessary to address this claim.

for MERV's business operations, but instead provided an additional source of funds for

misappropriation by Friedlander and Markowitz.

Finally, MERV alleges the cumulative effect of Yessin's mismanagement of MERV's

Operating Account caused its business to fail, resulting in lost profits.

MERV's fraud claim against Yessin starts with his alleged failure to disclose that he had an

independent business relationship with Friedlander and Markowitz.

> Kentucky law . . . recognizes the tort of fraud by omission, which includes the
> following four elements: (1) that the defendants had a duty to disclose a fact or
> facts, (2) that the defendants failed to disclose such fact, (3) that the failure to
> disclose induced the plaintiff to act, and (4) that the plaintiff suffered actual
> damages therefrom.

*GATX Corp. v. Addington*, 879 F. Supp. 2d 633, 646 (E.D. Ky. 2012).

As to a claim of facilitation of fraud and theft, Kentucky recognizes a claim for aiding and

abetting tortious conduct.

> It is recognized that a party who, without privilege, aids or assists an agent to
> violate a duty to his principal is subject to tort liability to the principal.   In such a
> general situation there are two possible theories of liability, one being that one who
> knowingly and for his own end, and without justification, aids and abets or procures
> another to break a contract may be held liable to the other party to the contract for
> such damage as may accrue on the basis of the interference with the legal rights of
> another.   The other theory being that the agent's breach of duty to his principal is a
> tort as well as a breach of contract and the one procuring, aiding or abetting such
> breach is a joint tort feasor.

*Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 486 (Ky. 1991).   Under Kentucky

law,

> [O]ne is subject to liability [for aiding and abetting] if he (a) does a tortious act in
> concert with another or pursuant to a common design with him, or (b) knows that
> the other's conduct constitutes a breach of duty and gives substantial assistance or
> encouragement to the other so to conduct himself, or (c) gives substantial assistance
> to the other in accomplishing a tortious result and his own conduct, separately
> considered, constitutes a breach of duty to the third person.

*Bariteau v. PNC Fin. Servs. Grp., Inc.*, 285 Fed. App'x. 218, 224 (6th Cir. 2008) (internal

quotation marks omitted).

As MERV has failed to identify any evidence in support of a fraud claim (*see* discussion *supra* at LAW AND ANALYSIS, Part I.B.1-2), MERV cannot satisfy an essential element of its claim of facilitation against Yessin; i.e., the tortious conduct of a third-party in which Yessin allegedly substantially assisted.

Further, regardless of whether Yessin had a conflict of interest in serving as MERV's private banker that he failed to disclose, MERV's fraud claim against Yessin rises or falls on the existence of evidence that in such position, Yessin: (i) had control over MERV's Operating Account; (ii) approved deposits of the Manchester Construction Fund into MERV's Operating Account; and (iii) determined which checks drawn upon the account would be paid by Fifth Third.[23]

In support of its claim regarding Yessin's control over the account, MERV offers Collins' testimony that two Fifth Third tellers, whose names she could not recall, told her that Yessin was "over" MERV's Operating Account and that all transactions related to the account required Yessin's approval because he was the private banker assigned to the account.   However, Collins' testimony of what the tellers said or what they meant by "over" is inadmissible hearsay.   FED. R. EVID. 801.   MERV presents no admissible evidence that a private banker has such control over a customer's account.   MERV identifies nothing in Fifth Third's procedures that supports its position that all transactions with respect to a customer's account are required to be approved by its private banker if one is assigned to the customer.

Rather, the only admissible evidence establishes the contrary:   A private banker is assigned to some customers for the purpose of establishing a point of contact in the event the customer has an issue or question concerning its business checking account.   Yessin testified that the responsibilities of a private banker do not include approving deposits into a customer's account

---

[23] Absent this, MERV's conflict of interest argument is a red herring and may highlight that disputes exist among MERV's members, but is not probative with respect to MERV's relationship with Fifth Third or Yessin.

or determining which checks drawn on an account would be honored.    With respect to his position

as MERV's private banker, Yessin stated:

> I did not approve any deposits made into MERV's account and I did not cause
> Fifth Third to honor any checks drawn upon MERV's account.    Specifically, I did
> not approve the deposit of any loan disbursement checks issued by Forcht Bank
> into MERV's account and I did not cause Fifth Third to honor any checks written
> upon MERV's account by Eric Friedlander or Howard Markowitz which bore only
> one signature.

[Yessin Aff. ¶ 10, Doc. 114-3].

MERV characterizes Yessin's affidavit as self-serving.    However, MERV does not

identify any *admissible* evidence to counter Yessin's testimony that he did not have or exercise

control over MERV's Operating Account so as to approve deposits from the Manchester

Construction Fund into the account or to permit unauthorized checks written on the account to be

honored.[24]    Further, MERV fails to identify any evidence that it incurred damages as a result of

the alleged unauthorized checks or improper deposits.    *See* discussion *supra* LAW AND ANALYSIS,

Part I.B.4.

Yessin is entitled to summary judgment as a matter of law as to Count V.

B.  Breach of Fiduciary Duty – Count VIII.

MERV alleges that "Yessin, as the Debtor's private banker, had a fiduciary duty and a duty

of fair dealing with the Debtor, its property and its minority owners."    [Compl. ¶ 94].    MERV's

allegations as to how Yessin breached this duty are the same as alleged above; *i.e.,* by using his

---

[24] Perhaps realizing this deficiency, in its response to Yessin's Motion, MERV attempts to add a claim against Yessin
that he breached a contract with MERV.    *See* MERV Resp. to Yessin Mot. 5, Doc. 133 (asserting that by virtue of his
position and management over the bank employee who opened MERV's account, Yessin breached a contract with
MERV that checks written on MERV's Operating Account would not be honored unless signed by two authorized
Signatories).    MERV does not offer any evidence of such a contract between it and Yessin.    Regardless, the Court
declines to address this attempt to present a new claim against Yessin.    *See Tucker v. Union of Needletrades, Indus. &
Textile Emps.*, 407 F.3d 784, 789 (6th Cir. 2005) (to permit non-moving party plaintiff to raise new claims in response
to summary judgment motion would subject defendants to unfair surprise; proper procedure would have been for
plaintiff to seek to amend complaint).

position of control over MERV's account to permit unauthorized checks to be honored and

improper deposits to be made into MERV's Operating Account.

To prevail on its claim of breach of fiduciary duty, MERV must prove that:   (1) Yessin

owed it a fiduciary duty; (2) he breached that duty; and (3) that MERV suffered damages as a result

of the breach.   *Fastenal Co.,* 609 F. Supp. 2d 650.

Yessin asserts that case law supports his position that he did not owe a fiduciary duty to

MERV.   However, the cases relied on by Yessin (to the effect that the courts' traditional view is

that a relationship between a bank and a depositor is generally one of a debtor-creditor and does

not ordinarily impose a fiduciary duty) are not entirely on point.   The aggrieved parties in those

cases sought to impose a fiduciary duty on the *bank* not on the *employee* of the bank.   Specifically,

in the case of *Snow Pallet, Inc. v. Monticello Banking Co.*, 369 S.W.3d 1 (Ky. Ct. App. 2012),

relied upon heavily by Yessin to establish that he had no such duty, the court stated that it was

making no findings with respect to whether the bank employee himself may have been liable to the

plaintiff because he was not a party to the action.   Rather, the court was considering only whether

the bank was vicariously liable for its employee's acts or omissions.   *Id.* at 5 n.3.   That said,

however, general statements in cases involving banking relationships and the creation of fiduciary

relationships are instructive.

> [B]ecause the circumstances which may create a fiduciary relationship are so
> varied, it is extremely difficult, if not impossible, to formulate a comprehensive
> definition of it that would fully and adequately embrace all cases.   Nevertheless, as
> a general rule, we can conclude that such a relationship is one founded on trust or
> confidence reposed by one person in the integrity and fidelity of another and which
> also necessarily involves an undertaking in which a duty is created in one person to
> act primarily for another's benefit in matters connected with such undertaking.
> This Court in the case of *Security Trust Co. v. Wilson,* 307 Ky. 152, 210 S.W.2d
> 336 (1948), quoted with approval the following definition of a fiduciary
> relationship:
>
> > The relation[ship] may exist under a variety of circumstances; it exists
> > in all cases where there has been a special confidence reposed in one who
> > in equity and good conscience is bound to act in good faith and with due

regard to the interests of the one reposing confidence.   307 Ky. at 157, 210 S.W.2d at 338.

*Steelvest*, 807 S.W.2d at 485.   "A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing."   *Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 891 (6th Cir. 2002).

> The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

*Id.* (citation omitted) (internal quotation marks omitted).   "Fiduciary relationship can be informal, but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other."   *Id.* at 893.   "A generalized trust in other businessmen and businesswomen cannot create a fiduciary relationship."   *Id.* at 895.

Yessin's appointment as MERV's private banker was merely to serve as a point of contact to assist MERV with issues or questions concerning its Operating Account.   Assigning a private banker to an account is a marketing service offered by Fifth Third to certain customers.   MERV offers no evidence that any special confidence was reposed in Yessin or that he received confidential information about MERV that he used to MERV's detriment.

Further, regardless of whether Yessin owed MERV a fiduciary duty, there is no evidence that Yessin had or exercised control over MERV's Operating Account or that MERV incurred any damages.   As such, MERV fails to identify evidence to support this claim.

Yessin is entitled to summary judgment as a matter of law as to Count VIII.

## CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law.   In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.

Defendants Friedlander, Fifth Third and Yessin met their burden of showing an absence of evidence to support MERV's claims against them.   MERV failed to present affirmative, admissible evidence to defeat the Motions for Summary Judgment.   There are no genuine issues of material fact and Defendants are entitled to judgment in their favor as a matter of law.   A separate order shall be entered accordingly.

54

_____

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Monday, May 04, 2015**
**(tnw)**